SHANNON LISS-RIORDAN (SBN 310719)
(sliss@llrlaw.com)
THOMAS FOWLER (*pro hac vice*)
(tfowler@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:     (617) 994-5800
Facsimile:     (617) 994-5801

*Attorneys for Plaintiffs Carolina Bernal Strifling*
*and Willow Wren Turkal, on behalf of themselves*
*and all others similarly situated*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| CAROLINA BERNAL STRIFLING and WILLOW WREN TURKAL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TWITTER, INC., and X CORP.,<br><br>Defendants | Case No. 4:22-cv-07739-JST<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: June 12, 2025<br>Time: 2:00 P.M.<br>Judge: Hon. Jon S. Tigar |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT,** on Thursday, June 12, 2025, or as soon thereafter as the matter may be heard before the Honorable Jon S. Tigar in Courtroom 6 of the United States District Court, Northern District of California, located at 1301 Clay Street, 2nd floor, Oakland, California 94612, Plaintiffs Carolina Bernal Strifling and Willow Wren Turkal will and hereby do move this Court for Class Certification. Specifically, Plaintiffs move the Court to certify a class under Fed. R. Civ. 23(b)(3) that includes all women who were notified of their layoff by Twitter on November 4, 2022.

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................. 2

III. ARGUMENT ...................................................................................................... 7

    A.   Legal Standard for Class Certification ....................................................... 7

    B.   The Proposed Class Satisfies Rule 23(a)'s Prerequisites ........................... 8

        1.   Numerosity ........................................................................................ 8

        2.   Commonality ..................................................................................... 8

        3.   Typicality ......................................................................................... 15

        4.   Adequacy ......................................................................................... 15

    C.   The Proposed Class is Maintainable Under Rule 23(b)(3) ...................... 17

        1.   Common questions predominate over questions affecting individual class members ............................................................... 17

        2.   A class action is the superior mechanism for addressing the employees' claims ......................................................................... 19

IV.  CONCLUSION ................................................................................................. 21

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Brnovich v. Democratic Nat'l Comm.*,
    594 U.S. 647 (2021)........................................................................................ 10

4

5

*Chen-Oster v. Goldman, Sachs & Co.*,
    325 F.R.D. 55 (S.D.N.Y. 2018) ..................................................................... 18

6

7

*Chen-Oster v. Goldman, Sachs & Co.*,
    449 F. Supp. 3d 216 (S.D.N.Y. 2020)........................................................... 20

8

*Chun-Hoon v. McKee Foods Corp.*,
    2006 WL 3093764 (N.D. Cal. Oct. 31, 2006)................................................ 17

9

10

*Doe v. AmericaPAC and Elon Musk*,
    2:25-cv-01691-WB, Order (Dkt. 13) (E.D. Pa. Apr. 22, 2025) ..................... 20

11

*Ellis v. Costco Wholesale Corp.*,
    240 F.R.D. 627 (N.D. Cal. Jan. 11, 2007) .................................................... 15

12

13

*Frederick-Osborn v. Twitter, Inc.*,
    2024 WL 1354529 (N.D. Cal. Mar. 29, 2024)................................................. 9

14

15

*Freeman v. Package Mach. Co.*,
    865 F.2d 1331 (1st Cir.1988)........................................................................ 10

16

17

*Gay v. Waters' and Dairy Lunchmen's Union, Local No. 30*,
    694 F.2d 531 (9th Cir. 1982) ........................................................................ 11

18

19

*Gonzales v. Hilton*,
    Case No. 4:14-cv-01523-JSW (N.D. Cal. Jan. 3, 2022) ............................... 16

20

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ...................................................................... 18

21

22

*Harris v. Palm Springs Alpine Ests., Inc.*,
    329 F.2d 909 (9th Cir. 1964) .......................................................................... 8

23

24

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002) ...................................................................... 13

25

*Herrera v. LCS Fin. Servs. Corp.*,
    274 F.R.D. 666 (N.D. Cal. 2011)................................................................... 20

26

27

*In re Univ. of S. California Tuition & Fees COVID-19 Refund Litig.*,
    695 F. Supp. 3d 1128 (C.D. Cal. 2023) ........................................................ 18

28

*In re Yahoo Litig.*,
  308 F.R.D. 577 (N.D. Cal. 2015) ...................................................................... 18

*James v. Uber Techs.*,
  Case No. 3:19-cv-06462, Order re Plaintiffs' Motion for Class Certification (N.D.
  Cal. Jan. 26, 2021) ...................................................................... 17

*Johnson v. City of Grants Pass*,
  72 F.4th 868 (9th Cir. 2023) ...................................................................... 7, 8

*Kamm v. Cal. City Dev. Co.*,
  509 F.2d 205 (9th Cir. 1975) ...................................................................... 19

*Lopez v. Pacific Maritime Association*,
  2009 WL 10680881 (C.D. Cal. April 3, 2009) .............................................. 13

*Lowe v. City of Monrovia*,
  775 F.2d 998 (9th Cir. 1985) ...................................................................... 11

*Luviano v. Multi Cable, Inc.*,
  2017 WL 3017195 (C.D. Cal. Jan. 3, 2017) ................................................ 20

*Lytle v. Nutramax Laboratories, Inc.*,
  114 F.4th 1011 (9th Cir. 2024) ...................................................................... 9

*Ma v. Twitter, Inc.*,
  Case No. 4:23-cv-03301-JST, slip op. at 4-7 (N.D. Cal. Apr. 22, 2024)......................... 20

*Martin v. Tango's Restaurant, Inc.*,
  969 F.2d 1319 (1st Cir. 1992) ...................................................................... 20

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ...................................................................... 7

*McDonnell Douglass Corp v. Green*,
  411 U.S. 792 (1973) ...................................................................... 11

*Nitsch v. Dreamworks Animation SKG, Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016) ................................................................ 20

*Nnebe v. Daus*,
  2022 WL 615039 (S.D.N.Y. Mar. 1, 2022) ...................................................... 18

*O'Connor v. Uber Techs., Inc.*,
  2015 WL 5138097 (N.D. Cal. Sept. 1, 2015), *rev'd and remanded on other
  grounds*, 904 F.3d 1087 (9th Cir. 2018) ...................................................... 17

*Ordono v. Marriott International Inc.,*
   CGC-16-550454, Order Re Plaintiffs' Motion for Class Certification (Cal. Sup. Ct.
   Sept. 17, 2021) ............................................................................................................. 17

*Overka v. American Airlines, Inc.,*
   265 F.R.D. 14 (D. Mass. 2010) .................................................................................... 20

*Parsons v. Ryan,*
   754 F.3d 657 (9th Cir. 2014) ........................................................................................ 15

*Perez v. Safety-Kleen Systems, Inc.,*
   253 F.R.D. 508 (N.D. Cal. 2008) .................................................................................. 20

*Pottenger v. Potlach Corp.,*
   329 F.3d 740 (9th Cir. 2003) ........................................................................................ 13

*Rittmann v. Amazon, Inc.,*
   2024 WL 4932745 (N.D. Cal. W.D. Wash. Dec. 2, 2024) ............................................ 20

*Roman v. Jan-Pro Fran. Int'l., Inc.,*
   342 F.R.D. 274 (N.D. Cal. 2022) .................................................................................. 16

*Rushing v. Williams-Sonoma, Inc.,*
   2020 WL 6787135 (N.D. Cal. Oct. 8, 2020) ................................................................ 21

*Smilow v. Southwestern Bell Mobile Systems, Inc.,*
   323 F.3d 32 (1st Cir. 2003). .......................................................................................... 17

*Staub v. Proctor Hosp.,*
   562 U.S. 411 (2011) ...................................................................................................... 10

*Stern v. DoCircle, Inc.,*
   2014 WL 486262 (C.D. Cal. Jan. 29, 2014) ................................................................ 18

Travers v. Flight Services & Systems, Inc.,
   737 F.3d 144 (1st Cir. 2013) ......................................................................................... 10

*Tsur v. Intel Corp.,*
   --- F. Supp. 3d ---, 2022 WL 17985573 (D. Or. Dec. 29, 2022) ................................. 13

*Valentino v. Carter-Wallace, Inc.,*
   97 F.3d 1227 (9th Cir. 1996) .......................................................................................... 7

*Villalpando v. Exel Direct Inc.,*
   303 F.R.D. 588 (N.D. Cal. 2014) ............................................................................. 8, 18

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) .................................................................................................. 8, 15

*Wang v. Chinese Daily News, Inc.*,
    737 F.3d 538 (9th Cir. 2013) ........................................................................ 8

*Watson v. Fort Worth Bank & Trust*,
    487 U.S. 977 (1988) .................................................................................... 13

*Weinberg v. Twitter, Inc.*,
    2024 WL 3908112 (N.D. Cal. Aug. 21, 2024) ............................................. 11

*Zeman v. Twitter, Inc.*,
    747 F. Supp. 3d 1275 (N.D. Cal. 2024) ....................................................... 20

**Statutes**

California Fair Employment and Housing Act ("FEHA"), Gov. Code § 12900, *et seq* ................ 1

Older Workers' Benefits Protections Act, a part of the Age Discrimination in
    Employment Act ("ADEA"), 29 U.S.C. § 626(f) ......................................... 4

Title VII, 42 U.S.C. § 2000e, *et seq* ...................................................................... 1

**Rules**

Fed. R. Civ. P. 23 ..................................................................................... passim

1

2

**I.     INTRODUCTION**

3           This case is brought by former Twitter employees Carolina Bernal Strifling and Willow

4   Wren Turkal, on behalf of themselves and other female employees of Defendants (hereafter

5   referred to as "Twitter"), who were notified of their layoff on November 4, 2022, just days after

6   multi-billionaire Elon Musk purchased the company. *See* Third Amended Class Action

7   Complaint (Dkt. 87).  Plaintiffs bring claims of sex discrimination under Title VII, 42 U.S.C. §

8   2000e, *et seq.*, and (for employees who worked in California) the California Fair Employment

9   and Housing Act ("FEHA"), Gov. Code § 12900, *et seq.*

10          Following Elon Musk's acquisition of Twitter on October 27, 2022, he immediately

11  implemented a mass layoff, notifying 50% of the company on November 4, 2022, that they

12  were being laid off.  Plaintiffs were among those laid off. The layoff decisions were made

13  under extremely hurried circumstances by a small group of advisors and managers under close

14  supervision by Elon Musk. These advisors included his two young cousins (James and Andrew

15  Musk), longtime advisors who have worked with him on his other businesses, as well as

16  managers Mr. Musk brought in from his other companies including Tesla and SpaceX.  The

17  data show that women were selected for layoff at a statistically significantly higher rate than

18  men. This disparity is unsurprising given the unapologetic sexist attitude of Mr. Musk, who

19  was the ultimate decisionmaker in the layoff decisions.  Further, against the recommendation of

20  managerial employees at Twitter, Twitter did not conduct a disparate impact analysis before

21  implementing the layoffs, and indeed ██████████████████████████████

22  ████████████████

23          Pursuant to Fed. R. Civ. P. 23, Plaintiffs move for the Court to certify a class consisting

24  of women who were notified of their layoff by Twitter on November 4, 2022.  Plaintiffs' claims

25  raise common questions of: (1) whether women were disproportionately impacted by the

26  layoffs; (2) whether Elon Musk's discriminatory animus against women led to the

27  disproportionate number of women who were laid off; (3) whether the greater proportion of

28  women laid off at Twitter is the result of intentional discrimination against women; and (4)

whether the greater proportion of women laid off at Twitter constitutes illegal unintentional yet illegal disparate impact.

For the class as a whole, the case will hinge on the answers to these common questions, which thus will predominate over any potential individual issues. As will explained below, the critical evidence in this case – Mr. Musk's animus toward women, the data demonstrating that the layoff impacted a disproportionate number of women, and the extremely hurried manner in which the layoff was executed (without taking into account skills, job performance, managerial feedback on employees, or other reasonable objective criteria) – was common to the class as a whole. This case amply meets the requirements of Fed. R. Civ. P. 23(a) and 23(b). As such, class certification should be granted.[1]

## II.    BACKGROUND

Elon Musk purchased Twitter on October 27, 2022, and quickly implemented a mass layoff, notifying half of the company (including Plaintiffs) on November 4, 2022, that they were being laid off.  (Email Approving Layoffs dated 11/2/2022, Ex. 1; Executive Overview dated 11/2/2022, Ex. 2; Rule 30(b)(6) Dep. at 18, Ex. 3; Strifling Dep. at 221-23, Ex. 4; Turkal Dep. at 177-78, Ex. 5.)  Plaintiff Willow Wren Turkal was a Staff Site Reliability Engineer at Twitter (Turkal Dep. at 85, Ex. 5; Turkal Offer Letter, Ex. 6), and Plaintiff Carolina Bernal Strifling was a Senior Account Executive (non-engineer). (Strifling Dep. at 79, Ex. 4; Strifling Offer Letter, Ex. 7.)  On November 4, 2022, Plaintiffs learned that they were part of the mass layoff at Twitter. (Strifling Dep. at 221-23, Ex. 4; Turkal Dep. at 177-78, Ex. 5; November 4 Layoff Email, Ex. 8.)

---

[1]    Further, as discussed below, Plaintiffs' counsel are in the process of individually arbitrating claims of more than 2,000 Twitter individual employees who were laid off after Mr. Musk's acquisition of the company.  Many of these employees have brought sex discrimination claims, presenting the evidence summarized above. ██████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████

The data clearly show that the layoff impacted a statistically significant greater proportion of women than men. (Expert report of Dr. Mark Killingsworth ("Killingsworth Report"), at Sec. 2 ¶ 2 and Table 1, Ex. 9.) Prior to the layoffs that day, Twitter employed approximately 2,234 female employees and 2,761 male employees in the United States. *Id.* Of those employees, approximately 1,305 females and 1,256 males were notified that day they were being laid off. Thus, 56.2% of female employees were chosen for layoff on November 4, 2022, as compared to 45.5% of male employees. *Id.* Not only is this a large percentage difference, but it is also extremely statistically significant. *Id.* Indeed, a chi square statistical analysis reveals that this distribution in layoffs by sex is more than 7.5 standard deviations away from a normal distribution. *Id.* This is far greater than the recognized threshold for statistical significance, 1.96 standard deviations. *Id.* at Sec. 1 ¶ 6. In other words, were there no relationship between sex and likelihood of being part of the layoff, this distribution would occur less than 0.0001 of the time, or less than one chance in 10,000. *Id.*

While the disparity in women being laid off was high across the company, women in engineering were laid off at an even greater disproportionate rate as compared to men. Of 696 female Twitter engineers, 430 (or 61.8 percent) were chosen for layoff on November 4, 2022, as compared to 721 (or 44.9 percent) of Twitter's 1,605 male engineering employees. This disparity in termination rates also has an extremely high degree of statistical significance – more than 7.4 standard deviations. (*Id.* at Sec. 2 ¶ 3 and Table 2.) For non-engineers, 53.8 percent of women were laid off, compared to 46.3 percent of men, with a statistically significant standard deviation of more than 3.8.[2] (*Id.* at Sec. 2 ¶ 4 and Table 3.)[3]

---

[2]     Dr. Killingsworth also performed several "probit" (i.e. regression) analyses of the sex disparities in the layoff and found that, even taking into account various variables, such as job title, job family, and longevity at Twitter, the disparity between the rates of male and female employees being laid off was still statistically significant. (Killingsworth Report, at Sec. 3 ¶¶ 1-15 and Tables 1-3, Ex. 9.)

[3]     Twitter has argued that disparities in layoff rates between women and men should be analyzed by smaller groupings of employees. However, Twitter admitted in its "OWBPA" notice (a notice that employers are required to issue when they conduct mass layoffs, pursuant to

These disparities in the termination rates between men and women is unfortunately unsurprising, given Mr. Musk's significant history of public demeaning remarks showing his lack of respect for women in the workplace. Mr. Musk has made frequent juvenile jokes about women's body parts and has made clear his concern about the declining birthrate and belief that women should focus on being mothers, rather than their careers. He has also posted tweets of a sexual nature that women, including those who have worked for him in senior positions, have found offensive. Some examples include the following:

- Musk posted tweets in which he joked about women's breast sizes. He wrote, "D's get degrees" and "Equal support for left and right!" See Twitter (October 30, 2021), https://x.com/StockJoke/status/1454514744988090373 (attached as Exhibit 11).

- Musk posted tweets on Twitter in which he joked about naming a school using the acronym "TITS" and making other jokes about women's breasts. See Twitter (October 29, 2021 (attached as Exhibit 12); Chandra Steele, Elon Musk is a Misogynist and It Matters, PCMag (December 13, 2021), https://www.pcmag.com/opinions/elon-musk-is-a-misogynist-and-it-matters Elon Musk (quoting Musk's tweet: "Am thinking of starting new university: Texas Institute of Technology & Science") (attached as Exhibit 13). He later followed up that the school would have "epic merch." See Twitter (October 29, 2021), https://x.com/elonmusk/status/1453955363263291394 (attached as Exhibit 14).

- On August 17, 2022 (just a couple months before acquiring Twitter) Musk, who has been vocal about promoting women having a lot of babies (suggesting that is more important than their jobs), tweeted: "Being a Mom is just as important as any career." See Twitter (August 17, 2022), https://twitter.com/elonmusk/status/1559823434028400640 (attached as Exhibit 15).

- On November 20, 2022, Musk tweeted "And lead us not into temptation…" and included a drawing of a woman with the Twitter logo covering her lifted skirt. See Twitter (November 20, 2022), https://x.com/elonmusk/status/1594500655724609536?lang=en (attached as Exhibit 16).

- On December 4, 2022, Musk tweeted: "Testosterone rocks ngl". See Twitter (December 4, 2022), https://twitter.com/elonmusk/status/1599345615443746817 (attached as Exhibit 17).

the Older Workers' Benefits Protections Act, a part of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626(f)), that the "decisional unit" for the layoffs was "all United States employees within all organizations of the Company reporting to or up to the CEO as of December 28, 2022." (OWBPA Disclosure ¶ 2, Ex. 10.) Moreover, as summarized below, the layoffs were chosen in a matter of a few days across the company, not workgroup by workgroup; indeed, employees across the company were recommended for layoff by a small group of managers and advisors to Mr. Musk who scrambled quickly to identify which employees across the company met Mr. Musk's very subjective criteria of being "excellent" and "critical".

- Following his acquisition of Twitter, Musk had the "w" on the sign of the corporate headquarters painted white so that the company's name appeared to be "Titter." See Twitter (April 9, 2023), https://twitter.com/elonmusk/status/1645266104351178752?cxt=HHwWgIC-7cGzlNUtAAAA (attached as Exhibit 18).

- Musk later tweeted a picture suggesting that the shape of the Tesla Cybertruck was modeled after women's breasts. See Twitter (October 2, 2023), https://x.com/elonmusk/status/1708923551607099569?lang=en (attached as Exhibit 19).

The offensiveness to women of these types of comments should be readily apparent. Notably, however, even top employees at Twitter (who worked under Mr. Musk) have expressed concern about Mr. Musk's sexist comments and tweets. For example, ████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Likewise, ████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████

It is highly significant that Mr. Musk has very publicly and unapologetically espoused such sexist views. The evidence shows that Mr. Musk was the ultimate decision-maker in the layoffs. He brought in a hand-picked team of advisors, family members, and employees from his other companies like Tesla and SpaceX (almost all of whom were male) to make selections regarding thousands of employees in just a few days. ██████████████████████████ █████████████████████ They had little access to information about those employees, such as performance reviews, and had to make extremely rushed decisions about employees who they did not know, doing their best to figure out what Mr. Musk wanted.[4] ██████ ████████████ ██████████████████████████████████

---

[4] ██████████████████████████████████████████ The layoffs were implemented so haphazardly that, ████████████████████████████████████████████ ██████████████████████████████████████████████

1    While Mr. Musk's team of advisors took recommendations from some prior Twitter

2  managers regarding who to retain and who to layoff, the evidence shows that Mr. Musk's team

3  overrode those decisions, and Mr. Musk himself was the final decisionmaker for the layoffs.

4  ████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████

6  ███   Notably, Mr. Musk was known to announce repeatedly following his acquisition of the

7  company: "There is one decision-maker, and that's me." ████████████████████ [5]

8    Also undermining Twitter's contention that layoffs were decided based on employees'

9  actual criticality and excellence, the pre-acquisition Twitter managers who were asked to make

10  recommendations regarding the layoffs were given just a matter of hours to make their

11  recommendations from long lists of employees, most of whom they did not know, and without

12  being given access to information about their work performance and without being permitted to

13  consult with their direct managers.  For example, ██████████, a pre-acquisition Twitter manager,

14  was ordered to Twitter headquarters the morning of Saturday, October 29, 2022) to put together

15  a recommended layoff list. ██████████████████████  He (like other managers who arrived

16  at the office with him) was handed a list of more than 600 employees, most of whom he did not

17  know, and was told to recommend who to lay off in just a matter of hours.  While he knew some

18  names on the list, who he marked as "critical", the rest of the selection process was "random"

19  and "arbitrary". ███████████████████  He and the other managers who were called in to

20  perform this task were not permitted to speak with employees' direct level managers, nor given

21  access to performance evaluations. (*Id.*)  When they were finished, they submitted their lists to

22  the Space X and Tesla engineers, who told them they would be sharing the lists with Elon Musk

23  who would make the final decision. ████████████████████  The employees were not told

24  to conduct a disparate impact analysis nor given the tools or resources to do so. ████████████

25

26  ─────────────────────

27  [5]    When warned that some of his actions might raise concerns about legality, he would say:
  "Do I look like someone who cares about the law?" and "Let them sue us." ████████████████

28  ███████████

1  ████████

2  Elon Musk ████████████████████████████████

3  ████████████████████████████████████

4  ████████████████████████████████████

5  ████████████ His cousin who helped with the layoffs ████████████

6  ████████████████████████████████

7  ████████████████████████████

8  ████████████████████████████████

9  ████████████████████████

10 ██████████████████████████████

11 ████████████████████████████████

12 ████████████████████████████

13 ████████████████████████████

14 ████████████████████████████████

15 ████████████████

## III.    ARGUMENT

### A.    Legal Standard for Class Certification

Rule 23 provides two steps for certifying a class action. Fed. R. Civ. P. 23. First, the plaintiffs must establish the four prerequisites of Rule 23(a). *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Courts refer to these prerequisites as "numerosity, commonality, typicality and adequacy of representation." *See, e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

Next, the plaintiffs must show that the proposed class is proper under Rule 23(b). *Johnson v. City of Grants Pass*, 72 F.4th 868, 885 (9th Cir. 2023). A class is proper under Rule 23(b)(2) when the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate" for the whole class. Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) allows class treatment when "questions of law or fact common to class members predominate over any questions affecting only individual

members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**B.    The Proposed Class Satisfies Rule 23(a)'s Prerequisites**

**1.    Numerosity**

To satisfy the numerosity requirement a proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23 (a)(1). "[I]mpracticability does not mean impossibility, but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964). "Although the requirement is not tied to any fixed numerical threshold, courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members." *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605–06 (N.D. Cal. 2014).

Here, there is no question that the proposed class satisfies numerosity. Data produced by Twitter indicates that of the 2,561 Twitter United States employees who were notified of their layoff on November 4, 2022, 1,305 of them were women. (Killingsworth Report at Sec. 2 ¶ 22 and Table 1, Ex. 9.)[6]

**2.    Commonality**

"A class satisfies Rule 23's commonality requirement if there is at least one question of fact or law common to the class." *Johnson*, 72 F.4th at 887 (citing *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013)). In assessing commonality, courts ask whether the putative class claims "depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "That common contention, moreover, must be of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* There are several contentions both of law and fact that are

---

[6]    With regard to the California claim, Twitter was headquartered in San Francisco, California, and many thousands of employees worked in California (and were laid off in California). The Court can easily infer that the California claim satisfies numerosity. Plaintiffs do not anticipate that Twitter will dispute numerosity for the California class on this basis.

common to the class.

With respect to Plaintiffs' sex discrimination claims, there are several central common factual and legal questions as to whether the layoffs at issue in this case were discriminatory against women.[7] Here, Plaintiffs' claims present the common question of whether Twitter, through Mr. Musk's conduct, and the intentionally haphazard method through which the layoffs were conducted (and then without an adverse impact analysis conducted). engaged in intentional discrimination against women.[8] Plaintiffs have provided evidence showing that Mr. Musk regularly and publicly has made sexist comments and Twitter posts. Plaintiffs have also submitted evidence that Mr. Musk was directly involved in the layoffs and was indeed the ultimate decisionmaker. This evidence raises common questions regarding Mr. Musk's intentional discriminatory behavior toward women at Twitter – and whether it led to the gross disparities in layoff rates between women and men.

Furthermore, even though Twitter will argue that Mr. Musk could not have made all the layoff decisions himself, but instead relied on recommendations coming from his team, courts have recognized that, even when the lead decision-maker (such as a company owner or CEO) does not implement layoff decisions himself—but instead the decisions are carried out by managers pursuant to the owner's spoken or unspoken desires—an inference of discrimination can be drawn based upon the likely influence of their boss on that decision-making. For example, in *Travers v. Flight Services & Systems, Inc.*, the First Circuit explained:

> A CEO sets the tone and mission for his subordinates, many of whom presumably consider it an important part of their jobs to figure out and deliver what the CEO wants.

---

[7] The requirements under the California FEHA are generally the same as under Title VII. *See Frederick-Osborn v. Twitter, Inc.*, 2024 WL 1354529, at *3 (N.D. Cal. Mar. 29, 2024) ("California courts apply the Title VII standard and analysis to discrimination claims under the FEHA.") (internal citations omitted).

[8] At the class certification stage, Plaintiffs of course do not need to prove the claim on the merits – they need only demonstrate whether the claim raises common issues. *See Lytle v. Nutramax Laboratories, Inc.*, 114 F.4th 1011, 1025 (9th Cir. 2024) ("Requiring that class action plaintiffs actually prove classwide injury at [the class certification] stage would improperly conflate the class certification inquiry with the merits.").

737 F.3d 144, 147 (1st Cir. 2013).[9] *See also Brnovich v. Democratic Nat'l Comm.*, 594

U.S. 647, 689 (2021)) (explaining that the law allows a plaintiff "to hold the plaintiff's

employer liable for 'the animus of a supervisor who was not charged with making the

ultimate [adverse] employment decision'" if the animus may have affected the adverse

decision (quoting *Staub v. Proctor Hosp.,* 562 U.S. 411, 415 (2011))).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

█████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

_____

[9]     In *Travers*, the plaintiff presented evidence that the company owner harbored animus against him, but the defendant argued that the decision to terminate him was not made by the owner and was instead made by a manager acting independently. The First Circuit rejected the defendant's argument that the owner's bias could not be considered relevant, explaining that:

> [S]uch strongly held and repeatedly voiced wishes of the king, so to speak, likely became well known to those courtiers who might rid him of a bothersome underling. *See Freeman v. Package Mach. Co.,* 865 F.2d 1331, 1342 (1st Cir.1988) (observing in a discrimination case that "[t]he battle plan of the admiral is a valid datum in assessing the intentions of the captain . . . .").

*Travers*, 737 F.3d at 147.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

██████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████ Elon

Musk's discriminatory statements, and the degree to which they should or should not be dismissed as stray remarks, will not vary among Plaintiffs or class members.

Plaintiffs' claims present the common question of whether the stark disparities in the termination rates between men and women in the layoff are the result of discriminatory animus. The Ninth Circuit has consistently held that "generalized statistical data is relevant and admissible at the prima facie case stage of a disparate treatment employment discrimination lawsuit." *Gay v. Waters' and Dairy Lunchmen's Union, Local No. 30,* 694 F.2d 531, 550 (9th Cir. 1982); *see also Lowe v. City of Monrovia*, 775 F.2d 998, (9th Cir. 1985) ("A disparate treatment plaintiff may rely on statistical evidence to establish a *prima facie* case . . . or to show that a defendant's articulated nondiscriminatory reason for the employment decision in question is pretextual.") (internal quotation omitted). Whether under the *McDonnell Douglas* framework or a pattern or practice framework, statistical data can be highly probative as a means of demonstrating an employer's discriminatory intent *McDonnell Douglass Corp v. Green,* 411 U.S. 792 (1973). *See Gay*, 694 at 550. Here, the statistical evidence that Plaintiffs have presented support a disparate treatment claim, regardless of whether the Court considers it to be under the *McDonnell Douglas* framework or a pattern or practice framework.

In analyzing substantially identical allegations in *Weinberg v. Twitter, Inc.*, 2024 WL 3908112, at *6-7 (N.D. Cal. Aug. 21, 2024), and finding that the plaintiffs adequately alleged disparate impact discrimination, as well as disparate treatment discrimination, the court relied on reasoning common to the entire class:

> In the course of the RIF that occurred following Musk's acquisition of the company, Musk supervised a small group of managers who lacked knowledge of Twitter's operations and who gave little if any consideration to employees'

performance, qualifications, experience, and abilities to conduct a rushed decision-making process regarding who to lay off. Plaintiffs present substantial factual allegations in support, including preliminary statistical analyses and evidence of Musk's discriminatory animus, which support an inference of a causal relationship.

The Ninth Circuit's opinion in *Freyd v. University or Oregon*, 990 F.3d 1211 (9th Cir. 2021), additionally supports Plaintiffs' argument. In *Freyd*, the Ninth Circuit acknowledged that the plaintiff challenged a specific employment practice by challenging the university's practice of providing retention raises without analyzing relevant factors like merit and seniority to determine whether other comparable faculty also deserved raises. *Id.*

Here, Plaintiffs similarly allege that Twitter declined to consider relevant factors in making layoff selections such as experience and abilities. Plaintiffs' allegations regarding the discriminatory outcomes of the RIF are sufficiently specific at this stage. Plaintiffs allege that "[t]he decisions regarding which employees would be laid off were made under extremely hurried circumstances, with little if any regard given to employees' job performance, qualification, experience, and ability," and that "the layoff decisions were made quickly by a small group of managers, under close supervision of Musk." The Ninth Circuit has held that "an employer's facially neutral practice of committing employment decisions to the subjective discretion of supervisory employees [is] a specific employment practice properly subject to a disparate impact analysis." *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990); *see also Pottenger*, 329 F.3d at 749 (holding that a "policy of committing employment decisions in a RIF to the subjective discretion of its managers constitute[s] a specific employment practice").

*Weinberg*, 2024 WL 3908112, at *8–9.



Plaintiffs' claims also present the common question of whether Twitter is liable for sex discrimination under a theory of disparate impact. Under both the Title VII and the FEHA, to establish discrimination through disparate impact, a plaintiff must: "(1) identify a specific practice of the Defendant, (2) show a disparate impact on a protected class, and (3) establish a causal relationship between the practice(s)." *Lopez v. Pacific Maritime Association*, 2009 WL 10680881, at *5 (C.D. Cal. April 3, 2009) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994-95 (1988); *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1190 (9th Cir. 2002)). "The Ninth Circuit has concluded that a reduction in force can be a specific employment practice that supports a disparate impact claim." *Tsur v. Intel Corp.*, --- F. Supp. 3d ---, 2022 WL 17985573, at *13 (D. Or. Dec. 29, 2022) (citing *Pottenger v. Potlach Corp.,* 329 F.3d 740, 749 (9th Cir. 2003)).

The question of whether the manner in which Twitter carried out the layoff caused a disparate impact on women is common to the class. Plaintiffs offer classwide evidence that the frantic and reckless nature of the layoffs, combined with the use of highly subjective criteria such as who was "critical" and "excellent" at the company, resulted in a highly statistically significant disparate impact on women. (█████████████████████████████████████████████ Killingsworth Report, Ex. 9.) Not only did Twitter not perform a disparate impact analysis when determining who would be laid off, ██████████████████████████████ ████████████████████████████████████████████████████████ ██████████████—even though such analyses are standard practice ████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████ █ █ ████████ ████████ ██████ █ █ ██████████

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION



PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### 3.    Typicality

Typicality asks whether "the claims or defenses of the representative parties are typical" of the class. Fed. R. Civ. P. 23 (a)(3). Typicality is a "permissive standard[ ]." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citation omitted). Courts consider whether class members have the "same or similar injury" caused by "the same course of conduct." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (citation omitted). "Thus, typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.* (cleaned up).

As the Supreme Court recognized in *Wal–Mart,* Rule 23(a)'s commonality and typicality requirements "tend to merge." 564 U.S. at 350 n.5. "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.*

Plaintiffs and the putative class members suffered the same injury—sex discrimination against women—resulting from the same course of conduct—Twitter's layoff decisions that resulted in a statistically significant disparity in the proportion of women laid off as compared to men. Thus, the proposed class meets Rule 23(a)'s typicality standard. *See Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627, 641 (N.D. Cal. Jan. 11, 2007) ("The class representatives have demonstrated that they will present the same type of legal and remedial theory as the unnamed class members, namely that the subjective processes for promotion to AGM and GM positions discriminate against female employees.").

### 4.    Adequacy

Adequacy of representation is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23 (a)(4). Representation is adequate if: (1) the class representative and counsel do not have any conflicts of interest with other class members; and (2) the representative plaintiff and counsel will prosecute the action vigorously on behalf of the class. *Staton*, 327 F.3d at 954.

First, there is no potential conflict between the named Plaintiffs and the other class members since they are challenging an event that impacted all class members, including themselves. As discussed in the typicality section, the named Plaintiffs' interests are in alignment with those of each class member, in that they seek to vindicate their same sex discrimination claims.

Plaintiffs have also retained counsel with extensive expertise and experience in prosecuting employment class actions, as well as extensive discrimination cases.  Plaintiffs' counsel's firm, Lichten & Liss-Riordan, P.C. has been widely recognized as one of the leading plaintiffs' firms representing workers.  See Chambers and Partners, Profile of Lichten & Liss-Riordan P.C., https://chambers.com/department/lichten-liss-riordan-pc-labor-employment-mainly-plaintiffs-usa-5:1983:12703:1:22364446 (attached as Exhibit 36) (regularly recognizing Lichten & Liss-Riordan, P.C. as a top tier plaintiffs' employment firm; Lichten & Liss-Riordan Website, https://www.llrlaw.com (attached as Exhibit 37).  Plaintiffs' lead counsel, Shannon Liss-Riordan, is widely recognized as one the nation's leading class action employment lawyers. See Shannon Liss-Riordan, Biography, https://www.llrlaw.com/shannon-liss-riordan/ (attached as Exhibit 38); see also "America's Top 200 Lawyers," FORBES (March 26, 2024) (listing Attorney Liss-Riordan as one of the top 200 attorneys in the United States, and one of just a handful of plaintiffs' employment lawyers on the list) (attached as Ex. 39); "Benchmark US 2020 awards" BENCHMARK LITIGATION (Feb. 27, 2020) (naming Shannon Liss-Riordan "Labor & Employment Employee-Side Attorney of the Year") (attached as Ex. 40).

Plaintiffs' counsel have regularly been appointed as class counsel in this district.  See, e.g., Roman v. Jan-Pro Fran. Int'l., Inc., 342 F.R.D. 274, 290 (N.D. Cal. 2022) (appointing Liss-Riordan and her firm as Class Counsel) (summary judgment granted in favor of certified class, in case that plaintiffs prevailed on in Ninth Circuit and California Supreme Court); Gonzales v. Hilton, Case No. 4:14-cv-01523-JSW (N.D. Cal. Jan. 3, 2022) Order re Plaintiffs' Motion for Class Certification (certifying class and appointing Plaintiff's counsel as Class Counsel in a case whose dismissal was successfully reversed at the Ninth Circuit); Ordono v. Marriott

*International Inc.,* CGC-16-550454, Order Re Plaintiffs' Motion for Class Certification (Cal. Sup. Ct. Sept. 17, 2021) (similarly appointing Liss-Riordan and her firm as Class Counsel) (resulting in verdict for certified class following 2023 trial); *James v. Uber Techs.,* Case No. 3:19-cv-06462, Order re Plaintiffs' Motion for Class Certification (N.D. Cal. Jan. 26, 2021); *O'Connor v. Uber Techs., Inc.*, 2015 WL 5138097, at *36 (N.D. Cal. Sept. 1, 2015), *rev'd and remanded on other grounds,* 904 F.3d 1087 (9th Cir. 2018) ("Uber does not even argue that Ms. Liss-Riordan is unqualified to represent these Plaintiffs, and any such argument would be without merit. The Court knows Ms. Liss-Riordan to be a capable advocate, and further notes that she is a leading practitioner in the field of employment [law] both in this District and nationwide…..").

### C.    The Proposed Class is Maintainable Under Rule 23(b)(3)

Two conditions must be met to maintain a class under Rule 23(b)(3). First, "questions of law or fact common to class members [must] predominate over any questions affecting only individual members." Fed. R. Civ. P. 23 (b)(3). Second, "a class action [must be] superior to other available methods for fairly and efficiently adjudicating the controversy. *Id.*

### 1.    Common questions predominate over questions affecting individual class members

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Anchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The requirement is "merely that common issues predominate, not that all issues be common to the class." *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 39 (1st Cir. 2003). "Because no precise test can determine whether common issues predominate, the court must pragmatically assess the entire action and the issues involved." *Chun-Hoon v. McKee Foods Corp.,* 2006 WL 3093764, *2 (N.D. Cal. Oct. 31, 2006). "A court evaluating predominance must determine whether the elements necessary to establish liability are susceptible to common proof or, if not, whether there are ways to manage effectively proof of any element that may require individualized evidence." *Villalpando v. Exel Direct, Inc.*, 303

F.R.D. 588, 608 (N.D. Cal. 2014). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citation omitted); *see also In re Univ. of S. California Tuition & Fees COVID-19 Refund Litig.,* 695 F. Supp. 3d 1128, 1155-61 (C.D. Cal. 2023) (certifying class of implied contract claims because students had received same promise of in-person education, albeit from different sources).

Here, common questions of law and fact will predominate. As explained above, the case will focus on: (1) whether women were disproportionately impacted by the layoffs; (2) whether Elon Musk's discriminatory animus against women led to the disproportionate number of women who were laid off; (3) whether the greater proportion of women laid off at Twitter is the result of intentional discrimination against women; and (4) whether the greater proportion of women laid off at Twitter constitutes illegal unintentional yet illegal disparate impact. *See Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 79-83 (S.D.N.Y. 2018) (finding plaintiffs met predominance in a case alleging sex discrimination with regard to compensation and promotion, where plaintiffs offered data demonstrating a disparate impact, which can also be used to establish disparate treatment). As such, common issues predominate on Plaintiffs' claims, and class treatment is appropriate.

Notably, in a class action, it is not necessary for all issues to be common. Classes can be certified even where there are important common issues, as well as individual issues. *See In re Yahoo Litig.,* 308 F.R.D. 577, 592 (N.D. Cal. 2015) (noting that "not all issues have to be common to satisfy Rule 23(a)(2)'s commonality requirement") (quoting *Stern v. DoCircle, Inc.*, 2014 WL 486262, at *4 (C.D. Cal. Jan. 29, 2014).[10]

---

[10]    As an example, in a recent case litigated by Plaintiffs' counsel, *Nnebe v. Daus*, 2022 WL 615039 (S.D.N.Y. Mar. 1, 2022), the plaintiffs obtained a ruling that was common to a class of taxi drivers, namely that the City of New York's process for allowing drivers to challenge their license suspensions following a criminal arrest did not meet due process standards. While the district court certified a class based on this issue, it determined that, in order to recover damages,

### 2.    A class action is the superior mechanism for addressing the employees' claims

The superiority requirement is designed to ensure the "'vindication of the rights of groups of people who individually would be without effective strength to bring their opponents to court at all.'" *Anchem Prods.*, 512 U.S. at 617.  A district court has "broad discretion" in determining whether class treatment is superior.  *Kamm v. Cal. City Dev. Co.,* 509 F.2d 205, 210 (9th Cir. 1975).  The following factors are pertinent to this analysis:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23 (b)(3).  Here, a class action is clearly a superior method. It would be grossly inefficient to require each employee to bring a case alleging identical claims of sex discrimination, resulting in increased expense, duplication of discovery, and potential for inconsistent results.  Even if damages issues require individualized assessments, the efficiencies gained by use of a class action for common questions will ultimately benefit all of the class members, and Defendants, by dramatically reducing litigation expenses.  Moreover, the fact that individual employees might not vindicate their statutory rights would undermine the effectiveness of those rights, which protect workers and ensure fair competition. *See Martin v. Tango's Restaurant, Inc.,* 969 F.2d 1319, 1324 (1st Cir. 1992) (recognizing that employment

---

individual class members would need to show that the City's practices led to their own unfair continued license suspension.  The court thereafter ordered a trial for randomly selected class members.  After those class members prevailed at that trial, the parties negotiated a classwide settlement. *Nnebe v. Daus,* Civ. Act. No. 06-cv-4991, Motion for Settlement (Dkt. 740) (S.D.N.Y. March 14, 2025). Plaintiffs do not offer this example in order to concede that individualized trials would be necessary in this case, but only to demonstrate that, even where not <u>all</u> issues are common, class certification is still appropriate where important common issues exist, and the Court has tools it may use to allow evidence regarding individual class members to be considered if necessary.

laws are "intended to protect complying competitors of the defendants, in addition to making the employee whole").

Moreover, "class adjudication is superior in the employment context because fear of employer retaliation may have a chilling effect on employees bringing claims on an individual basis." *Overka v. American Airlines, Inc.*, 265 F.R.D. 14, 24 (D. Mass. 2010). Indeed, numerous courts have held that class actions are superior in employment cases because of the prospect of retaliation. *See, e.g., Perez v. Safety-Kleen Systems, Inc.,* 253 F.R.D. 508, 520 (N.D. Cal. 2008). Here, given Mr. Musk's penchant for attacking employees on social media ███████████████████████, retaliation is a real concern.[11] Permitting Plaintiffs to prosecute their claims on behalf of the proposed class meets these challenges and provides a superior method of resolving the claims of the putative class members.[12]

---

[11]    *See also Doe v. AmericaPAC and Elon Musk,* 2:25-cv-01691-WB, Order (Dkt. 13) (E.D. Pa. Apr. 22, 2025) (allowing plaintiff to proceed anonymously in case against Elon Musk, where he demonstrated real concerns of retaliation by Musk, given Musk's historic – and recent – national behavior engaging in retaliation against those who challenge him).

[12]    Twitter may argue that a number of putative class members' agreement to arbitrate their claims precludes certification. However, courts have recognized that the existence of arbitration agreements among putative class members does not defeat certification of a class if the class representative is not subject to arbitration. *Luviano v. Multi Cable, Inc.,* 2017 WL 3017195, at *16 (C.D. Cal. Jan. 3, 2017) (holding that merits of arbitration defense were not before the court and did not defeat class certification); *Nitsch v. Dreamworks Animation SKG, Inc.*, 315 F.R.D. 270, 284 (N.D. Cal. 2016); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 681 (N.D. Cal. 2011) ("The fact that some members of a putative class may have signed arbitration agreements or released claims against a defendant does not bar class certification.").
Moreover, under the caselaw, courts are to consider class certification **prior to** considering whether to compel arbitration for class members who may be bound by arbitration agreements. *See Zeman v. Twitter, Inc.*, 747 F. Supp. 3d 1275, 1285-87 (N.D. Cal. 2024); *Rittmann v. Amazon, Inc.,* 2024 WL 4932745, at *2-5 (N.D. Cal. W.D. Wash. Dec. 2, 2024); *Ma v. Twitter, Inc.*, Case No. 4:23-cv-03301-JST, slip op. at 4-7 (N.D. Cal. Apr. 22, 2024). Moreover, those class members with arbitration agreements are not even formally before the Court at this time. *See Chen-Oster v. Goldman, Sachs & Co.,* 449 F. Supp. 3d 216, 234–35 (S.D.N.Y. 2020) (collecting cases); *Rushing v. Williams-Sonoma, Inc.*, 2020 WL 6787135, at *2-3 (N.D. Cal. Oct. 8, 2020) ("[The defendant] could not move to arbitrate claims against [the plaintiff] or against unnamed class members before class certification.")

## IV.    CONCLUSION

For the foregoing reasons, the Court should certify a class under Fed. R. Civ. 23(b)(3) that includes all women who were notified by Twitter of their layoff on November 4, 2022.

Respectfully submitted,

CAROLINA BERNAL STRIFLING and WILLOW WREN TURKAL, on behalf of themselves and all others similarly situated,

By their attorneys,

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan, SBN 310719
Thomas Fowler (*pro hac vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com; tfowler@llrlaw.com

Dated:          April 24, 2025

## <u>CERTIFICATE OF SERVICE</u>

I, Shannon Liss-Riordan, hereby certify that a true and accurate copy of this document was served on counsel for Defendant Twitter, Inc. and X Corp. via the CM/ECF system on April 24, 2025.

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION